T. O. JOHNSON ET AL., ON BEHALF OF THEMSELVES, AND OF SUCH OTHER CITIZENS AND TAXPAYERS OF WAKE COUNTY AS MAY MAKE THEMSELVES PARTIES TO THIS ACTION, v. THE BOARD OF COMMISSIONERS OF WAKE COUNTY, THE STATE HIGHWAY COMMISSION ET AL.

(Filed 17 November, 1926.)

**1. State Highway Commission—Discretionary Powers—Courts — Change of Route—Statutes—Highways—Injunction.**

Where the State Highway Commission has taken over a certain public road within a county, as a link in the State system of public highways, and the county in which it is situate has contracted to·loan the State Commission a certain amount of money to be expended on its improvement, subject to the approval of the voters in issuing bonds for the purpose, and there is nothing in the contract that would require the route of the existing road to continue as it then was laid out: *Held,* the discretionary power vested in the State Highway Commission as to changing the route, vesting in them by statute, will not be interfered with by the courts, at the suit of the taxpayers residing in a corporated or unincorporated town, contending that they would not have voted for the bond issue except upon representation made to them that the then existing route would not be changed. As to whether an unincorporated town is a "principal town" within the meaning of the statute. Quære?

36—192

**2. Same—Contracts — Agreements Made Beforehand as to Exercise of Discretionary Powers.**

The State Highway Commission, neither by contract nor otherwise, can be controlled beforehand in the exercise of its discretion, conferred on it by statute, as to the change of location of a public highway.

CLARKSON, J., concurring in result.

APPEAL by defendants from order of *Bond, J.,* dated 15 September, 1926, continuing to the final hearing a temporary restraining ·order theretofore issued in this action. From WAKE. Reversed.

Action to enjoin and to restrain perpetually defendants from expending certain funds in the construction of Route 21, of the State highway system, unless same shall be constructed as located prior to and at the time of an election held in Wake County, on 20 October, 1925. Said funds are the proceeds of the sale of bonds issued by the board of commissioners of Wake County, pursuant to such election, and were loaned, or are to be loaned, by said board to the State Highway Commission under the provisions of a written contract between said board and said commission, dated 4 August, 1925.

Plaintiffs allege that Route 21 had been located prior to said election by the State Highway Commission so˙ as to approach the town of Varina, in Wake County, from the north, and to pass into and through said town, and ·thence in a southerly direction to the Harnett County line; that in order to provide funds to be loaned to said highway commission by the board of commissioners of Wake County, for the construction of said Route 21, and of other routes included in the State highway system, in Wake County, an election was called by said board to determine whether or not bonds should be issued by the board for that purpose; that prior to said election, it was represented to plaintiffs and to other citizens and voters of Wake County, that if said election should result favorably to the issuance of said bonds, Route 21, as then located, would be constructed by the State Highway Commission and paid for out of funds loaned to said commission by the board of commissioners of Wake County derived from the sale of said bonds; that relying upon said representations, plaintiffs and others voted for the issuance of said bonds, and that but for such representations they would not have so voted; that since the said election, resulting in favor of the issuance of said bonds, and since the sale of the same, the State Highway Commission· has changed the location of Route 21, and is now constructing the said route upon a location which does not approach the town of Varina from the north, and does not pass into and through said town, and thence to the Harnett County line; that by reason of the change in the location of Route 21, and of the expenditure of funds

derived from the sale of said bonds in the construction of said route otherwise than as located at the time of said election, defendants are wrongfully diverting said funds from the purpose for which said bonds were authorized by the voters of Wake County.

Defendants deny that representations as alleged in their complaint were made to plaintiffs, with respect to the location of Route 21; they expressly deny that defendants, or either of them, made or authorized others to make such representations; they allege that said bonds were authorized by the voters of Wake County by an election called by the board of commissioners of said county, pursuant to a petition filed according to law with said board, and that the proceeds of said bonds have been loaned to the State Highway Commission pursuant to a written contract, between said board and said commission, dated 4 August, 1925; and that the fund derived from the sale of said bonds has been and will be expended by defendants in accordance with said contract, and as authorized by the voters of Wake County, at said election.

Defendants further deny that Route 21, extending from Raleigh south to the Harnett County line, was located by the State Highway Commission, or otherwise, prior to or at the time of said election, as plaintiffs allege, and aver, on the contrary, that while preliminary surveys were made under the direction of the commission, and rights of way secured, for the location of said Route 21, prior to said election, as alleged in the complaint, location of said route was not finally determined by said commission, until the funds for its construction were in hand or available; and that said highway commission now proposes to construct, and was engaged in the construction of, said Route 21, until restrained by the temporary order issued herein, as finally located by said highway commission in the exercise of the discretion vested in said commission by law.

Upon the hearing of the order to show cause why the temporary restraining order should not be continued to the final hearing, Judge Bond was of the opinion that defendants had failed to show such cause, and thereupon signed an order denying defendants' motion to dissolve said temporary restraining order, and continuing same to the final hearing, in order that issues of fact, arising upon the pleadings, might be submitted to and passed upon by a jury. From this order defendants appealed to the Supreme Court.

J. R. Baggett, Brantly Womble and R. N. Simms for plaintiffs.

Attorney-General Brummitt and Assistant Attorney-General Ross for State Highway Commission.

Percy J. Olive for Board of Commissioners of Wake County.

CONNOR, J. Prior to 4 August, 1925, the State Highway Commission, pursuant to the provisions of chapter 2, Public Laws of 1921, had designated, taken over and assumed control of certain roads or highways in Wake County as parts of or links in the system of State highways, as proposed by said commission, acting under the authority of said statute. The said commission had been unable theretofore to construct said roads or highways, because sufficient funds for that purpose had not been available prior to said date.

On said date an agreement was entered into between the board of commissioners of Wake County and the State Highway Commission, by which said board agreed to advance said commission a fixed sum of money, to be used in the construction of said roads, provided the voters of Wake County, at an election to be held thereafter, should approve the issuance of bonds required for raising said sum. The highway commission obligated itself to repay such sums as might be advanced under this agreement out of any funds which should thereafter come into its hands, allocated for construction of the State highway system in Wake County.

Thereafter, on 20 October, 1925, an election was held, and the issuance of said bonds approved by a majority of the voters of the county. These bonds have been issued and sold by the board, and the proceeds loaned to the commission, pursuant to the agreement, which is valid, and authorized by statute. *Young v. Highway Commission,* 190 N. C., 52; *Lassiter v. Comrs.,* 188 N. C., 379.

Among the roads in Wake County theretofore taken over by the State Highway Commission, as parts of or links in the State highway system, was the road extending from Raleigh south to the Harnett County line. This road constituted a part of or a link in Route 21, of said system. It is shown on the map, which was attached to and formed a part of the bill enacted by the General Assembly as chapter 2, Public Laws 1921. The word "Varina" appears on said map, indicating, as plaintiffs contend, the approximate location of a town of that name on said road. It is conceded that at the time of the enactment of said bill no incorporated town of that name was located on said road. There is uncontradicted evidence on this record that there was then and is now a community located on said road, as it existed at the time the statute was enacted, known and designated for many purposes as the "Town of Varina"; said community maintains a railroad station, a post office, a bank, a hotel, about twenty stores, markets for the sale of cotton, tobacco and other farm products, and residences for a prosperous and thrifty population. It is the trading and marketing center for a prosperous agricultural section, including portions of several counties. A part of the territory occupied by said community is included within the

corporate limits of the town of Fuquay Springs, which was incorporated by chapter 167, Private Laws of 1915; a large part of the business and residential sections of said community, however, is outside the said corporate limits. It does not appear that there are any fixed or definite limits to or boundaries of the territory occupied by said community.

Plaintiffs contend that said "Town of Varina," although not incorporated as a town, is a "principal town," within the meaning of the proviso in section 7, ch. 2, Public Laws 1921, and that therefore it cannot be disconnected from the State highway system by the exercise of the admitted power of the State Highway Commission, subject to the proviso, to change, alter, add to or discontinue the roads shown on the map, as constituting the State highway system, proposed by the General Assembly. It does not appear upon this record that any map, showing the roads in Wake County, comprising links in the State highway system, as proposed by the State Highway Commission, in accordance with the provisions of the statute, was ever posted at the courthouse door in said county. Nor is there evidence that said highway commission had made a final decision under the provisions of the statute as to the location of the road, extending from Raleigh south to the Harnett County line, prior to the date of the election on 20 October, 1925. It is not necessary for us now to decide the interesting question presented by plaintiff's contention, whether incorporation is a requisite of a "principal town," as that term is used in the provision in section 7, ch. 2, Public Laws 1921. Upon the facts appearing on this record, we must hold that the State Highway Commission, not having theretofore finally decided upon the location of Route 21, had the power conferred by statute to change the road extending from Raleigh south to the Harnett County line, and to adopt a new location for said road, as a part of or a link in Route 21; such power is not affected by the fact that the word "Varina" appears on the map, for whether Varina is a principal town or not, it appears that Route 21, as now located, passes within 300 feet of the railroad station in said town. It cannot be held as a matter of law that upon the admitted facts, Varina has been disconnected from or deprived of the service of the State highway system. No question or issue of fact involved in the decision of the highway commission with respect to the location of Route 21 is raised by the pleadings requiring that it be submitted to or passed upon by a jury; whether the highway commission had the power to change the location of the road, presents a question of law only, to be determined by the Court. We are of the opinion that the highway commission had such power, and that upon the facts alleged in the complaint its exercise of such power is not subject to judicial review.

The decision of this Court in *Newton v. Highway Commission, ante,* 54, has no application to this case. The opinion written by *Brogden, J.,* in that case is not an authority for holding that upon the facts of this case the highway commission was without power to locate Route 21, as it has done since the date of the election. Nor is the decision in *Cameron v. Highway Commission,* 188 N. C., 84, necessarily determinative of the question here presented.

The validity of the bonds issued and sold by the board of commissioners of Wake County, in order to provide funds to be loaned by said board to the State Highway Commission, to enable said commission to build, immediately, and without waiting for funds from the State, portions of or links in the system of State highways, located in Wake County, is not questioned by plaintiffs in this case. They contend that by reason of representations made to them and to other voters of Wake County, with reference to the location of Route 21, the State Highway Commission has no power to abandon the location of said route, which they allege was made prior to the election, and to adopt another location, which does not approach Varina from the north, or pass into and through Varina, or to use the funds loaned to it by the board of commissioners to construct the route upon the new location. They do not allege that the board of commissioners or the highway commission made the representations with respect to the location of said route, upon which they allege they relied, in voting for the issuance of said bonds; they allege that said representations were made by a member of the commission, acting in his individual and not in his official capacity, and by advocates of the issuance of the bonds. No evidence was offered at the hearing that such representations were made by either the board or the commission, or that they were authorized or ratified by either.

Neither the board nor the commission can be controlled or affected, as to the manner in which they shall exercise their discretion with respect to the expenditure of the proceeds of said bonds, or with respect to the location of roads to be constructed and paid for out of funds derived from the sale of said bonds, by representations of an individual member of the State Highway Commission made prior to the date of the agreement between the board and the commission or by the representations of advocates of the issuance of said bonds, made during the campaign preceding the election, as to the location of roads to be constructed thereafter by the highway commission and paid for out of advancements to be made to said commission by the board of commissioners of Wake County.

Defendants deny that representations were made, as alleged in the complaint; no issue of fact, however, is thereby raised, which would be determinative of the rights of the parties to this action. If it should

be found by a jury, upon proper allegations in the complaint, supported by competent evidence, that both the board and the highway commission had, prior to the election, not only represented to plaintiffs that they would but had, further, each acting in its corporate capacity, for a valuable consideration, received by said board or said commission for sole benefit of the public, agreed to construct said Route 21, upon a fixed and definite location, such finding would not support a judgment or decree giving to plaintiffs relief as demanded or prayed for in their complaint. Such an agreement would be void, and unenforceable by the courts, as against public policy. Neither the board nor the commission can absolve itself from its duty, or deprive itself of its right, to exercise discretion vested in each by law in the performance of a public duty, when called upon to perform such duty, by representations made or agreements or contracts entered into, with respect to the manner in which it will then act. Each is required to retain its freedom of judgment at all times, up to and including the very moment when it is called upon to act, so that its decisions when finally made will be influenced then only by a regard for the public welfare. *Edwards v. Goldsboro,* 141 N. C., 60.

An agreement or contract made by individuals with public officials for the purpose of influencing the exercise of discretion vested in them by law, as to the manner in which they shall perform public duties, although the consideration for such agreement or contract enures to the benefit of the public, is void as against public policy. Such officials cannot bind themselves by such agreements or contracts, nor can they be held bound by the courts. This well-settled principle certainly precludes the courts from rendering any judgment or decree in favor of plaintiffs in this case, who do not allege that there was any agreement, or contract with defendants, upon which they seek relief. It is not even alleged that the representations were made by defendants.

We are of the opinion that there was error in denying defendants' motion that the temporary restraining order be dissolved and in continuing the said order to the final hearing. There are no issues of fact to be submitted to or passed upon by a jury. The temporary restraining order should be dissolved. It is so ordered.

Reversed.

CLARKSON, J., concurring in the result: The State Road Act, Public Laws 1921, ch. 2, for so large an undertaking, is remarkably clear. The caption shows its purpose: "An act to provide for the construction and maintenance of a State system of hard-surfaced and other dependable roads connecting by the most practicable routes the various county-seats and other principal towns of every county in the State for the

development of agriculture, commercial and industrial interests of the State, and to secure benefits of Federal Aid therefor, and for other purposes."

The primary purpose was to take care of and foster the *agricultural, commercial and industrial* interest of the State. This was the service. The setting: In the different counties in the State at the time the State Highway Act was passed, the road-governing bodies of the counties had charge and control of the roads. Federal Aid had been expended on some of them. The county roads, to become part of the State system, the Legislature in its judgment and wisdom set forth in explicit language how they were to be taken over—with notice to the road governing bodies in the 100 counties of the State and a hearing, and in case of any objection, the hearing to be before the full commission, an appellate court as it were. The Legislature, as its agents, provided for ten highway commissioners, an administrative body, to carry out its will and mandate, giving this highway commission fixed, certain and limited powers. The largest appropriation ever made in the history of the State was made and this enormous sum to be spent on roads was not left to a commission of ten, no matter how capable, efficient and honest they may be, without limitations. The mandate of the Legislature was the building of a fixed system, mapped by it for the commission. The Legislature the creator, the commission the agency. "The terms of the proviso are positive and mandatory and not uncertain or discretionary." *Adams, J.,* in *Cameron v. Highway Commission,* 188 N. C., at p. 88. The whole history of the State heretofore was contrary to unlimited or arbitrary power. A map was attached to the act. It showed the 100 county-seats and marked on the map were the names of each county-seat, without calling it a county-seat. Also about 176 other places named on the map and the roads as shown on the map went through the county-seats and the other places named, as set forth on the map. The general purpose as set forth in the act, was for the State to lay out, take over, establish and construct and assume control of approximately 5,500 miles of hard-surfaced and other dependable highways running *to all county-seats and to all principal towns, State parks and principal State institutions,* etc., with *special view* of development of *agriculture, commercial and natural resources* of the State; further purpose of permitting the State to assume control of the State highway, repair, construct and reconstruct and maintain them at the expense of the State and relieve the counties, cities and towns of the State of this burden. The intent was to *establish and maintain* a State system to be hard-surfaced as rapidly as possible, *of durable hard-surfaced, all-weather roads connecting the various county-seats, principal towns and cities.*

The designation of all roads comprising the State highway system as proposed by the commission shall be mapped. A map showing the proposed roads to constitute the State highway system *"is hereto attached to this bill and made a part thereof."*

In taking over the roads (1) there shall be posted at the courthouse door in every county in the State, a map of all the roads in such county in the State system; (2) the board of county commissioners or county road-governing body of each county or street-governing body of each city or town of the State shall be notified of the *routes that are to be selected and made a part of the State system of highways.* (3) If no objection is made by the road-governing bodies above mentioned in sixty days after notification, *then and in that case the said roads or streets to which no objection is made shall be and constitute links or parts of the State highway system.* (4) If objections are made, then the whole matter shall be heard and determined by the State Highway Commission in session, under rules and regulations as may be laid down by them, but notice to be given by them of time and place of hearing (a) at the courthouse door, (b) newspaper published in the county, at least ten days prior to the hearing and the decisions of the State Highway Commission shall be final.

Under the system, the bond money is equitably distributed all over the State. The State was divided into nine construction districts with nine highway commissioners—one from each district, and a chairman who heads the commission. The bond money is distributed as follows: The area of land in a particular district to the total area of land in the State, the mileage of State roads in the district to the total mileage of roads taken over in the State and the population in the district to the population in the entire State. By this method each district has its equitable and proportionate part of the funds spent in the district, with no favoritism to any section of the State. The State as a unit was the goal in building the State system. The bill gives "equal rights to all and special privileges to none." The butter is spread all over the bread. The automobile and gasoline tax carries the entire burden of the system. To finance this system, the acts provide for the issuance of special bonds of the State, payable in not less than ten nor more than forty years from the date of issue—one-thirtieth paid each year—a broad building and loan plan.

The gist of the controversy is: "A map showing the proposed roads to constitute the State highway system is hereto attached to this bill and made a part thereof. The roads so shown can be changed, altered, added to or discontinued by the State Highway Commission: *Provided, no roads shall be changed, altered or discontinued so as to disconnect*

*county-seats, principal towns, State or National parks or forest reserves, principal State institutions and highway systems of other States.*"

It was set forth in the act that within sixty days after its ratification, the State Highway Commission shall commence to assume control and complete the assumption of control of all the roads which constitute the State highway system as rapidly as practicable. Then the powers are given in the act.

The Legislature, responsible to their constituents, took no chances. They had a map, naming the cities and towns on the map, and the roads are shown on the map going through these objectives, and that map was made a part of the act.

It was explicitly provided how the State system of roads would be taken over and when so done the proviso was clear: "*No roads shall be changed, altered or discontinued so as to disconnect county-seats, principal towns,*" etc. Then provision is made between these objectives, the highway commission "with full power to widen, relocate, change or alter the grade or location thereof." This was to avoid railroad crossings and make better grades in reference to the topography of the country, etc., between the fixed objectives—county-seats and principal towns named on the map. If all the towns put on the map, incorporated or not, were not considered principal towns in the State system, or only incorporated towns were intended, how easy to have said so. Why would the map show the roads through the towns marked on the map, with no mention whether they were incorporated or not, if they were not principal towns?

In the present action, it appears that prior to the selection, the State Highway Commission had caused a survey of the *red route* to be made and had obtained rights of way for the said highway along said *red route*. The highway commission had not at the time made any other survey for the said highway location. And by the affidavits of about one hundred and sixty citizens in said territory, filed in this case, these allegations are supported, and it is set forth that it was represented to the affiants and generally to the people of the southern section of Wake County, that if the money was raised by the bond issue to build said highway, it would be constructed along the *red route,* and *to* and *through* the *town of Varina.* And further that these representations were what caused the election to be carried, the same having been won by a narrow margin.

The reasonable and righteous construction of the act is that every county-seat and town marked on the map which the State highway ran through was a principal town—there were perhaps hundreds of others not marked on the map. Those that were marked, incorporated or not, were under this act the principal towns with the roads going through

them, and when taken over *could not be disconnected.* Perhaps, with a few exceptions, the roads mapped have been taken over and for years maintained by the State. The senator from Robeson County, who was the leader in the Senate in putting over this road program, said before this Court that the road bill would not have received a half dozen votes under any other construction except as herein given. If the people of the State in the hundred counties and in the towns marked on the map had any idea that their agency, the highway commission, could destroy these objectives—the county-seats and towns marked on the map—the more positive limitation on the power would be quickly felt. The people under our form of government are the sovereign. Powers that are not delegated to the United States or prohibited to the states or limited by the State Constitution, are in the people. In the present action, unfortunately for plaintiff, the record does not show that the road going through *Varina* to Lillington, though mapped through same, was ever taken over as part of the State system and maintained. Whose fault this is, the record does not disclose. It should have been done and the matter determined when the State roads were taken over. Not being done, the proviso in regard to disconnecting cannot apply. "What the statute hath joined together, the defendant cannot put asunder." *Brogden, J.,* in *Newton v. Highway Commission, ante,* p. 63. *Varina,* for some reason although shown on the map, was not joined to the State system. It was entitled to the ceremony, but it was never performed. The board of county commissioners, the road-governing body, now have the power which has never been exercised, so far as the record discloses, to demand that the road run through Varina, in accordance with the statute. The first contention of the plaintiff cannot be sustained from the record.

The next position taken is set forth in plaintiffs' brief: Plaintiffs contend that "contention was made in the lower court by the counsel of the defendants that they 'could not barter away their discretionary power' nor be bound by 'pre-election promises.' Our reply to this is that the law gives them no discretion as to how they will use money which they may receive impressed with the trust that it shall be used for a specific route and purpose. . . . It is a rather pitiful performance, any way, for a public official, or public officials, to seek to justify their action on the ground that they are not bound by 'pre-election promises.' A promise ought to be carried out, and a wholesome policy demands that even platforms shall bind the candidates that stand for election upon them. Surely the defendants' counsel will not insist that they should not keep faith with the folks." "A major question in this case relates to an alleged diversion of the fund. The aid of a court of equity is sought to prevent such alleged diversion."

This is good morals, and in a similar case of *Newton v. School Committee,* 158 N. C., at p. 188 (1912), the writer of this concurring opinion tried to impress this view on this Court and make it the law, but to no avail. It was there decided, and since reiterated in numerous decisions: "Courts may not interfere with discretionary powers conferred on these local administrative boards for the public welfare unless their action is so clearly unreasonable as to amount to an oppressive and manifest abuse of discretion." *School Committee v. Board of Education,* 186 N. C., p. 643.

These decisions are binding and have become the fixed law of this jurisdiction. There is no question but that the citizens in the town of Varina and community, in good faith, thought the road was going through Varina, as contemplated by the State map, from Raleigh to Lillington, and from the promises made by eminent individuals in an open letter interested in the bond issue:

*"Vote Tuesday, 20 October*
for
Good Roads and for the Progress of Raleigh and Wake County.

An open letter to all registered voters:

Remember the election 20 October. It is for you to say on that day how the next $1,300,000 justly apportionable to Wake County shall be expended.

For

If you vote for the proposition, you vote for the construction at once of the following hard-surfaced roads:

1. From Cary to the Chatham County line via New Hill.

2. *From Raleigh to the Harnett County line via Varina and Fuquay Springs.* (Italics mine.)

3. Connecting link between routes 90 and 91 at some convenient point in Little River Township, greatly benefiting both Wendell and Zebulon and that section of the county.

A vote for the proposition means the building of these roads *at once.*

*Again, if you vote for the proposition,* you determine once and for all how the next $1,300,000 justly apportionable to Wake County shall be applied. The matter is signed and sealed in a contract between the highway commission and the county board of commissioners of this county. All that is required is the ratification of the voters 20 October. . . .

Go to your precinct on Tuesday, 20 October, and vote early."

(2) The agreement for the advance of funds to hard surface certain roads in Wake County, made by the board of commissioners of Wake

County, and the State Highway Commission (by authority of *Young v. Highway Commissioners,* 190 N. C., p. 52) before the bond issue of $1,300,000 was voted, the contract designates the roads to be built as follows: "A portion of Route 50, extending from Cary south to the Chatham County line; a portion of Route 21, *extending from Raleigh south to the Harnett County line;* and a portion of Route 91 extending from some point on Route 90, hereafter to be. determined, to the Wake County line." The contract made with the State Highway Commission states that it was not binding on the board of commissioners until authorized by vote of the people to issue said bonds. The people voted under an open letter to *all registered voters* of the county—the road to go through *Varina.* This, no doubt, was well known to all the officials connected with this transaction. The open letter said it was *"signed and sealed"* in a contract with the highway commission and board of county commissioners.

A resolution of the board of county commissioners of Wake County, 30 December, 1925, is as follows: "In the matter of the location of Route 21, running south from Raleigh to the county line, it·was, on motion made by Commissioner Bennett, ordered that the board of commissioners of the county of Wake leave the location of said Route 21 entirely to the better judgment of the State Highway Commission, and the board will approve whatever location (is) adopted by the State Highway Commission." This resolution was affirmed on 16 February, 1926.

On 6 July, 1926, the minutes are as follows: "On motion made by Commissioner Wiggs, and duly seconded by Commissioner Bennett, the following resolution was adopted: 'Whereas, it appears from the reports of the engineering department of the State Highway Commission, and by reports of Prof. Harry Tucker, of the department of highway engineering of the State College, that the line as surveyed for Route 21 from Raleigh to Varina will cost approximately the sum of $50,000 to $60,000 less than any other survey presented on the map of the location of said Route 21, and eliminates all grade crossings, and serves an equally prosperous and thickly settled community of Wake County, and gives practically one-half mile shorter route from Raleigh to Varina.' Be it resolved by the board of commissioners of the county of Wake, if the statements and estimates be proven to be correct, we favor the adoption of the red line route for Route 21 to Varina."

From the record, Prof. Harry W. Tucker shows that 47/100 of a mile would be saved by going through Varina on the red route, as originally marked out, etc., and about $36,000.

On 21 July, 1926, the minutes were as follows: "On motion made by Commissioner Ray, and duly seconded by Commissioner Bennett, the

following resolution was unanimously adopted: 'In view of the fact that a large number of citizens of Southern Wake are petitioning the board with reference to the part of Route 21 designated as project 480: Resolved, that the board of commissioners of Wake County request a conference at the earliest possible moment with the chairman of said commission and · the commissioner from this district; and, Resolved further, that said commission be and is requested to hold up further expenditures of funds on this project until said conference be had.' The clerk and the attorney are instructed to arrange for the conference as early as possible, at a time and place to suit the said chairman and members of the highway commission."

(3) The open letter to the voters of Wake County was signed by fourteen of the most distinguished business and professional men of Raleigh. The voters in the county were notified from this open letter the road was to *go through Varina*—it said so—and no doubt voted bonds with that knowledge. The board of county commissioners have not as yet entirely crossed the Rubicon. They still can require the road to go through Varina. The record shows that promises were made in an open letter signed by men whose word in every-day life is their bond, before the vote was taken, by prominent high-minded citizens, that the road would go through Varina. The citizens of Varina and community relied on them, and it is alleged that enough votes were cast relying on` the pledge of the distinguished citizens and others, with authority, to change the election. The record shows that the *red route* was surveyed and staked out going through Varina, and rights of way were obtained *before the election*. The affidavits are many and similar to J. R. Suggs', who says in part: "It was represented to said petitioners and, as affiant is informed and believes, and understood and depended upon by practically all the persons who signed said petition that the said highway would be run along said surveyed route, which has since become known as the red star; and affiant says that during the campaign preceding the election called by the said commissioners to vote on said bond issue in pursuance of said petitions, it was uniformly at all times and everywhere represented to the people and understood and acted upon by them that the said bonds if voted would be spent to construct the said highway along the said route so surveyed. Affiant further says that he verily believes that if it had been represented to the people that the said highway would be builded along the old route, or which has since become known as the yellow route, the said election for said bonds could not have been carried and would not have been." It is contended by plaintiffs that the yellow route was an after-thought and camouflage, and started after the election and does not run through

the town of Varina. "Running to a county-seat is quite different from running around a county-seat." *Brogden, J.,* in *Newton's case, supra.*

I have written solely from the record in this case. Contracts are not "scraps of paper." Belgium maintained her neutrality and her honor at the expense and sacrifice of an enormous part of her human and material strength.

The plaintiffs say: "This is almost one of life and death with them. Their interests are being passed upon for all time. If they receive not this highway, which they claim and understood was promised to them, then they have no chance through the long years of the future to have a highway by their homes, for by no reasonable probability will another highway ever be builded that close to and nearly parallel to the one builded, if it shall be builded, along the yellow route."

In the case of *Cameron v. Highway Commission,* 188 N. C., p. 99, the writer of this concurring opinion said, and now repeats: "In my opinion neither this Court nor the State Highway Commission have the power to depart from the mandate of the Legislature and wipe from the road system of the State a road mapped *as going through Stem* (named on the map), taken over under the State act, kept up by the State, and make an entirely new road and hard surface it at the cost of about $1,000,000. If it can be done in this case, it can be done anywhere in the State, and a great act may become a "football" between contending factions. Such was not the legislative purpose. *The map and principal towns named on it were an orderly system and if followed will make for peace."*

In a radius of about thirty miles of the capital, we have had bitter controversies by not following the legislative map, treating it as a "scrap of paper." The controversy over the Milburnie and Pool route, the change contemplated wiping out the Milburnie road on the map. The case came here on the power of the board of commissioners to aid the State. *Lassiter v. Comrs.,* 188 N. C., p. 379. The *Cameron case,* where $1,000,000 was involved changing the road mapped through Stem; contrary to engineering advice, and making a new road paralleling the old road three to ten miles going through Creedmoor, the old road taken over under the map and maintained by the State Highway Commission for years. Now the present action with the Varina section of Wake County, feeling a moral and legal wrong has been done them.

When Lord Belhaven thought the rights of the people of Scotland were about to be sunk in the Treaty with England, concluding his wonderful classic oration, he said: "My God! What? Is this an entire surrender? My lord, I find my heart so full of grief and indignation, that I must beg pardon not to finish the last part of my discourse, but pause that I may drop a tear as the prelude to so sad a story."

From the record, Varina is remarkable for a town of its size, getting its life principally from agriculture—cotton and tobacco. The evidence, undisputed, as to Varina: The town has been in existence twenty-five years. At the junction of the main line of the Norfolk Southern and the Durham & Southern Railroads. A union station has been built by the railroads. It is the only cotton market in the southern section of Wake County and the leading tobacco market, drawing trade from the counties of Harnett, Lee, Moore, Hoke, Cumberland and Chatham. In 1925 it had the highest price tobacco market in the world, and the volume handled was 5,000,000 pounds. There are about twenty regularly scheduled trains a day passing through and stopping at the town. Annually about 500 cars of freight are handled. It has twenty stores, one bank, a handsome new bank building is now under construction, and three new brick stores. The Standard Oil Company maintains a distributing point for the southern section of Wake and Harnett counties there. More business has been regularly done in Varina than at any place in Wake County south of the city of Raleigh, and at any place between the city of Raleigh and the city of Fayetteville; yet it appears by the record that Harnett County petitioned the State Highway Commission to go the "yellow route" that cuts off Varina; yet it is Wake County money being expended, that Harnett County is trying to control, which shows the wisdom of the legislative map being followed.

It was the idea from the start to finish in the State road bill to take care of these small towns—agricultural towns supported by crops, mill towns, to encourage textile industry and other little commercial centers, to encourage the various industries of the State. Forty-seven of Varina's citizens are parties to this controversy and hundreds of others, fighting for the life of this splendid country town. Who will it hurt to go through it? From the record, I hope somehow or somewhere the Golden Rule may prevail: "Whatsoever ye would that men should do to you, do ye even so to them." No patriot would want his town destroyed, and seemingly from the record, without cause and in breach of promise made. It is contended by defendant highway commission that "selfish motives" actuated the plaintiffs. I quote the law of self-preservation from the Scriptures: "And if any provide not for his own, and especially for those of his own house, he hath denied the faith, and is worse than an infidel." 1 Tim., 5:8.

The board of county commissioners of Wake, the local body, has not surrendered as yet, as appears from the record. It knows the promise of eminent citizens, in their open letter. It has the power and the money raised to build the road. It is with them. So far we cannot hold on the record that they have violated any provision of law or

abused their sound discretion, or are influenced by improper motives or there is any misconduct on their part. By the last resolution, they seem to want the road to go through Varina, as promised by the eminent citizens. It is about one-half mile shorter and will save $36,000, so says an efficient civil engineer. It is with the board of county commissioners representing the taxpayers. It is the county's money; they are the guardians. The second contention of plaintiffs cannot be sustained.

I concur in the result of *Mr. Justice Connor's* opinion.